FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

2013 JUL 31 A 10: 57

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

Alliant Techsystems Inc., )
)
*Plaintiff*, )
)
v. ) Civil Action No. 1:13CV919-LO/IDD
)
Raytheon Company, d/b/a )
Raytheon Company Missile Systems )
)
*Defendant*. )
_____ )

## COMPLAINT

Plaintiff Alliant Techsystems Inc. ("ATK"), by its undersigned counsel, files this Complaint against Raytheon Company, d/b/a Raytheon Company Missile Systems ("RMS"), stating:

### PARTIES

1. ATK is a Delaware corporation with its principal place of business at 1300 Wilson Boulevard, Suite 400, Arlington, VA 22209.

2. Raytheon Company is a Delaware corporation with its principal place of business at 870 Winter Street, Waltham, MA 02451. Raytheon Company is a registered foreign corporation in the Commonwealth of Virginia and maintains offices in the Eastern District of Virginia. Upon information and belief, RMS is a business segment of Raytheon Company, with offices at 1151 E. Hermans Road, Tucson, AZ 85756.

### JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 because the dispute arises under Federal Acquisition Regulation clauses promulgated by

1

the U.S. Government and incorporated into purchase orders between the parties, and Plaintiff's right to relief depends on resolution of substantial questions of federal law. Further, the dispute involves the construction of purchase orders issued pursuant to federal government contracts connected with the national security, and is thus properly governed by uniform federal law.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is a corporation that resides in this judicial district, pursuant to 28 U.S.C. § 1391(c)(2).

## FACTUAL BACKGROUND

### Historical Background

5. Since the 1990s, RMS has supplied Advanced Medium-Range Air-to-Air Missiles ("AMRAAMs") to the U.S. Air Force and U.S. Navy pursuant to federal government contracts.

6. The AMRAAM is a sophisticated missile that has been integrated into fighter aircraft including the F-15, F-16, F/A-18, F-22 and the Joint Strike Fighter. The AMRAAM has been successfully used in combat in Iraq, Bosnia and Kosovo.

7. For more than 20 years, RMS and its predecessor companies have been purchasing rocket motors from ATK (formerly Hercules) that are used as a component of the AMRAAM. ATK's rocket motors are currently manufactured at ATK's Allegany Ballistics Lab ("ABL") in Rocket Center, WV.

8. Both RMS's federal prime contracts to provide the U.S. military with AMRAAMs and ATK's purchase orders to supply RMS with rocket motors to be used in the AMRAAMs require the expenditure of federal appropriated funds and implicate the national security interests of the United States.

**Rocket Motor Purchase Orders**

9. Currently, ATK is performing four open fixed-price purchase orders ("PO"s) requiring the delivery of AMRAAM rocket motors: PO 4200081161, dated October 26, 2007 ("BLRM Phase I PO"); PO 4200177249, dated June 22, 2009 ("Lot 23 PO"); PO 4200279248, dated June 23, 2010 ("Lot 24 PO"); and PO 4200230575, dated January 11, 2010 ("BLRM Phase II PO"). Additionally, ATK has completed delivery of rocket motors under PO4200101184 ("Lot 22 PO") (collectively, the "Rocket Motor POs").

10. The Rocket Motor POs require delivery of two variations of the AMRAAM rocket motor: the Integrated Wing Restraint ("IWR") rocket motor and the Baseline Rocket Motor ("BLRM"). In total, the Rocket Motor POs require the supply of 2,644 rocket motors. The delivery schedules for the two variations of the rocket motor set forth in the Rocket Motor POs run consecutively.

11. Each of the Rocket Motor POs incorporates by reference dozens of Federal Acquisition Regulation ("FAR") clauses. FAR clauses are promulgated by the U.S. Government and published in Title 48 of the U.S. Code of Federal Regulations for use as standard terms in federal government contracts.

12. Many of the FAR clauses incorporated into the Rocket Motor POs were required to be included under the terms of RMS's federal prime contracts.

13. Other FAR clauses, while not required by the FAR, were incorporated into the Rocket Motor POs by RMS and ATK to define their respective rights and responsibilities under standard federal government contract clauses.

14. Specifically, RMS and ATK chose to incorporate into each Rocket Motor PO, *inter alia*, FAR 52.249-8, Default, FAR 52.249-2, Termination for Convenience and FAR 52.243-1,

Changes. In addition, the BLRM Phase I and II POs and the Lot 22 and 23 POs incorporate FAR 52.233-1, Disputes.

15. The interpretation of each of these FAR clauses has been the subject of numerous decisions by federal Boards of Contract Appeals, the U.S. Court of Federal Claims, the U.S. Court of Appeals for the Federal Circuit, and their predecessor courts.

16. RMS and ATK are experienced government contractors with an understanding of standard FAR clauses and related federal case law interpreting those clauses.

17. By expressly choosing to define their contractual rights and responsibilities in accordance with standard FAR clauses used in federal government contracts, RMS and ATK impliedly agreed to the interpretations of those clauses established by federal courts and boards of contract appeals.

18. Each Rocket Motor PO contains the following clause:

> **Precedence of Government Regulations**
> In the event of any inconsistency or conflict between or among the provisions of Buyer's General Terms and Conditions of Purchase TC-001 and any U.S. government rule or regulation, the U.S. rule or regulation shall take precedence.

Purchase Order Attachment A, § 26 (BLRM Phase I and II POs and Lot 22 and 23 POs); Lot 24 PO, Attachment A, § 27.

## Specifications

19. The Rocket Motor POs incorporate detailed specifications for the AMRAAM rocket motors ("Rocket Motor Specifications") to be delivered. These specifications require the use of a propellant, designated as MG-844, which is produced with a specific process that combines eleven ingredients, in precise quantities.

4

20. Portions of the Rocket Motor Specifications incorporate various Government requirements via MIL SPECS (U.S. Military Specifications) that have been developed by the government over many years based on its experience in procuring weapons and weapons systems.

**Contract Testing Requirements**

21. ATK manufactures the rocket motors in lots consisting of approximately 50 motors each. The Rocket Motor POs require that ATK perform Lot Acceptance Tests on each lot.

22. One Lot Acceptance Test requires ATK to subject a sample motor from every other lot to a cold static fire. The cold static fire must be performed at -65°F, which purportedly represents the extreme temperature that may be encountered during the life of the rocket motor.

23. Nevertheless, the performance requirement imposed upon RMS by the government for a delivered AMRAAM missile is only -40°F. ATK has urged RMS to reduce the severity of the -65°F requirement to correspond with RMS's own contractual obligations to the U.S. Government, but RMS has refused to make that change.

**Technical Problems and ATK's Efforts to Remedy Those Problems**

24. For the first ten years that ATK's ABL facility supplied AMRAAM rocket motors to RMS, the rocket motors passed the -65°F cold static fire tests substantially without incident. In recent years, ATK has experienced anomalistic results from the rocket motor propellant during the cold static fire tests. As a result, multiple lots of rocket motors have failed the Lot Acceptance Tests due to failure to pass the cold static fire test. The failed lots of rocket motors were all manufactured strictly in accordance with the Rocket Motor Specifications.

25. Under the terms of the Rocket Motor POs, ATK must comply with the Rocket Motor Specifications and cannot deviate from them without express approval of RMS.


26. With RMS's knowledge and approval, ATK has expended significant time, resources and money seeking to determine the cause of the anomalistic behavior during cold static fire tests and to devise a solution. The root cause of the anomalistic behavior, as analyzed by ATK, Raytheon, the U.S. Government and academics, is that the design margins in the specifications for the components of the propellant recipe are inadequate to ensure consistent performance of the rocket motors during the cold static fire test. Because of the inadequacy of the design margins of the component materials, ATK has been unable to meet the original delivery schedules with the current contractually specified propellant, MG-844.

**RMS Development of Alternate Supplier**

27. In late 2000s, RMS decided to establish an alternative supplier for AMRAAM rocket motors.

28. RMS selected the Missile Products Division of Nammo AS ("Nammo"), located in Raufoss, Norway. Nammo develops and produces rocket motors primarily for the NATO market. Because Nammo had not manufactured the AMRAAM rocket motor, it was required to qualify its processes, procedures and production units before its rocket motors could be used in AMRAAMs supplied to the U.S. Government.

29. Thus, Raytheon has allowed Nammo to use a propellant formulation for its AMRAAM rocket motor that differs from that required under ATK's Rocket Motor POs.

30. During its qualification process, Nammo encountered significant difficulty in manufacturing the metal cases ("rocket motor cases") into which the propellant for the rocket motors is incorporated. Nammo was unable to timely manufacture rocket motor cases that complied with the AMRAAM specifications.

31. On or about January 20, 2012, RMS instructed ATK to provide Nammo with 30 ATK-made rocket motor cases.

32. On later occasions, RMS increased the number of ATK-made rocket motor cases RMS required ATK to provide to Nammo. In total, RMS has instructed ATK to provide 1108 rocket motor cases to Nammo. To date, ATK has delivered to Nammo approximately 994 rocket motor cases pursuant to RMS direction, and is in the process of delivering the balance. ATK provided the rocket motor cases in good faith, despite the lack of an agreement between RMS and ATK on the price for each case.

33. Manufacture of the rocket motor cases requires the use of specialized materials, including certain materials that can be provided by only a few suppliers in the country, and a rigorous, multi-step manufacturing process. Overall, manufacturing rocket motor cases takes well over one year to complete. Due to this long lead-time, RMS's requirement that ATK deliver rocket motor cases to Nammo left ATK without cases for the rocket motors it was to provide to RMS under the Rocket Motor POs.

**RMS Encouragement to Continue Performance and Cure Notices**

34. RMS has a representative on site at ATK's WV facility and is fully aware of ATK's production methods, testing procedures, and test results. RMS was also directly involved in the efforts to investigate and solve the AMRAAM rocket motor cold static fire testing problems.

35. RMS repeatedly encouraged ATK to continue performance of the Rocket Motor POs and to find a solution to the cold static fire test problems even after ATK started missing delivery dates.

36. On February 23, 2012, RMS sent ATK two cure notices. The first cure notice alleged that ATK was in breach of the Rocket Motor POs because of delinquent delivery performance. The second cure notice identified ATK's "production difficulties, resulting from unresolved technical and manufacturing issues" as "a condition which endangers the performance of the referenced purchase orders."

37. Both cure notices demanded that ATK provide a written plan and schedule for curing ATK's delinquent performance and production difficulties, and threatened that "[f]ailure to cure the above referenced delivery delinquencies...may result in termination for default under the terms and conditions of these purchase orders...."

38. On March 8, 2012, ATK provided a comprehensive response to the RMS cure notices, which outlined six related investigation tracks being pursued by ATK to resolve the cold static fire test problems, with support from rocket motor propellant technical experts from RMS, the government, and academia.

39. ATK's March 8, 2012 response demonstrated that ATK was expending significant time and money attempting to continue performance of the Rocket Motor POs.

40. ATK's March 8, 2012 response also contained a proposed amended delivery schedule.

41. RMS never accepted ATK's proposed amended delivery schedule, nor has RMS unilaterally established an amended delivery schedule.

42. Following RMS's February 23, 2012 cure notices and ATK's March 8, 2012 response, RMS continued to urge ATK to expend money in an attempt to find a solution to the technical problems and otherwise to continue performance of the Rocket Motor POs.

43. On March 19, 2012, RMS contacted ATK and requested that three additional rocket motors be added to the existing Rocket Motor POs.

44. On September 29, 2012 ATK and RMS leadership met in Chicago to discuss AMRAAM rocket motor performance issues. RMS leadership, for the first time, instructed ATK leadership to discontinue work on MG-844 propellant, specified in the Rocket Motor POs, and to shift resources to provide cases to Nammo and develop a new propellant. ATK complied with RMS's direction and began developing alternate propellant formulas to replace MG-844.

**Standstill Agreement**

45. On May 8, 2012, RMS and ATK entered into a Standstill Agreement which stated in part:

> RMS and ATK wish to avoid an escalation of this matter for the present time, as ATK attempts to resume production and delivery of rocket motors, while RMS' rights, ATK's rights, and the RMS Claims against ATK, and any ATK claims against RMS that exist as of the Effective Date are preserved.

Standstill Agreement, Recital C.

46. The Standstill Agreement further stated:

> 1. Any statute of limitation, any provision of the Subcontracts regarding time, and any other legal or equitable defense based on a lapse of time otherwise applicable to the RMS Claims are tolled from the Effective Date through the Termination Date as defined in paragraph 4. This Agreement will continue in effect until the Termination Date. This Agreement does not affect any defense based upon a statute of limitation (or the doctrine of laches or other similar doctrine based upon the passage of time) or provision of the Subcontracts regarding time that existed as of the Effective Date.
>
> 2. Except as provided in paragraph 1, neither RMS nor ATK waive, release or relinquish any rights, remedies, defenses or claims related to the Subcontracts that such party has or may have against the other that would exist in the absence of this Agreement, and the parties expressly reserve all such rights, remedies, defenses or claims.

> 3. During the term of this Agreement, (a) RMS will not terminate the Subcontracts in whole or in part, for default on the basis of ATK's performance under the Subcontracts, and (b) RMS will not initiate any litigation against ATK relating to such performance.

Standstill Agreement, ¶¶ 1-3.

47. The Standstill Agreement defined the "Termination Date" as "thirty (30) days after receipt by the person designated below of written Notice of Termination...." The ATK employee so designated is Matthew Lent.

48. On June 17, 2013, RMS mailed Notice of Termination to Mr. Lent, stating that the agreement "shall terminate effective 30 days from your receipt hereof."

49. The envelope containing the Notice of Termination was received at ATK's offices on June 19, 2013.

50. On July 30, 2013, RMS sent ATK a "Notice of Partial Termination for Default," terminating the portions of the Lot 23 and 24 POs pertaining to the remaining undelivered rocket motors.

51. Additionally, on July 30, 2013, RMS sent ATK a letter constituting "the written final decision of the contracting officer of [RMS] on RMS' claim against [ATK]" for breach of the Rocket Motor POs ("RMS Final Decision"). RMS's issuance of a contracting officer's final decision is consistent with the procedures set forth in FAR 52.233-1, Disputes. The RMS Final Decision asserted that ATK was in breach of all five Rocket Motor POs and that RMS had sustained damages in excess of $100 million.

## COUNT I: DECLARATORY RELIEF
## (EFFECTIVE PARTIAL TERMINATION FOR CONVENIENCE)

52. ATK repeats and re-alleges the allegations set forth in paragraphs 1 through 51 above.

53. RMS has instructed ATK to provide 1108 rocket motor cases to Nammo.

54. Upon information and belief, RMS is satisfying its delivery obligations to the U.S. Air Force by supplying AMRAAM missiles using rocket motors manufactured by Nammo that incorporate ATK-made rocket motor cases.

55. Given the significant lead time required to order steel for the production of additional rocket motor cases, RMS's instruction to ATK to provide the cases to Nammo is inconsistent with a desire that ATK deliver the full quantity of rocket motors required by the Rocket Motor POs.

56. Even if ATK were able to deliver immediately all rocket motors due under the Rocket Motor POs, without offset for the rocket motor cases ATK delivered to Nammo, RMS would not need the full number of motors because, upon information and belief, the quantity it is required to deliver to the Government has not increased.

57. RMS's direction to ATK to provide 1108 rocket motor cases to Nammo constituted an effective termination for convenience of a corresponding number of rocket motors due under the Rocket Motor POs.

58. Portions of a contract that have been terminated for convenience may not later be terminated for default.

59. Accordingly, ATK is not in default of the portions of the Rocket Motor POs pursuant to FAR 52.249-8, Default and FAR 52.249-2, Termination for Convenience.

WHEREFORE, ATK respectfully requests that the Court enter a declaratory judgment that ATK is not in default of the Rocket Motor POs because RMS's directions to ATK to supply rocket motor cases to Nammo constituted an effective partial termination for convenience of the Rocket Motor POs.

## COUNT II: DECLARATORY RELIEF
## (IMPOSSIBILITY/ IMPRACTICABILITY)

60. ATK repeats and re-alleges the allegations set forth in paragraphs 1 through 59 above.

61. As a result of RMS's direction to provide 1108 rocket motor cases to Nammo, ATK no longer possesses a sufficient number of rocket motor cases to produce the rocket motors due under the Rocket Motor POs.

62. Because it takes more than a year to manufacture the rocket motor cases, ATK, having been directed by RMS to divert rocket motor cases to Nammo, is unable to produce a sufficient number of additional cases to satisfy ATK's full contractual obligations.

63. Under FAR 52.249-8, Default, RMS's instructions to deliver rocket motor cases to Nammo rendered ATK's performance under the Rocket Motor POs impossible and/or commercially impracticable and in any case relieved ATK of any obligation it otherwise had to deliver the same number of rocket motors under its contract with RMS.

WHEREFORE, ATK respectfully requests that the Court enter a declaratory judgment that RMS's directions to ATK to provide rocket motor cases to Nammo have rendered ATK's performance of the relevant Rocket Motor POs impossible.

## COUNT III: DECLARATORY RELIEF
## (WAIVER OF DELIVERY SCHEDULE)

64. ATK repeats and re-alleges the allegations set forth in paragraphs 1 through 63 above.

65. Since the passage of the original delivery dates, RMS declined to terminate the Rocket Motor POs for default, and instead consistently encouraged ATK, both before and after the parties entered into the Standstill Agreement, to find a solution to the technical problems

delaying rocket motor production and to continue performance of the Rocket Motor POs. With the exception of the Lot 23 and 24 POs that RMS terminated on July 30, 2013, all other Rocket Motor POs remain open.

66. ATK relied on RMS's election not to terminate the Rocket Motor POs for default, and, pursuant to RMS's direction, expended significant time, resources and money on continued performance, all with RMS's knowledge, consent and encouragement.

67. RMS's election to allow ATK to continue performance past the contractual delivery dates constituted a waiver of the contractual delivery schedule for all Rocket Motor POs.

68. RMS's waiver of the contractual delivery schedule for all Rocket Motor POs existed at the time the parties entered into the Standstill Agreement.

69. RMS and ATK have not agreed to an alternative delivery schedule. Nor has RMS unilaterally established a reasonable and specific new contractual delivery schedule.

70. There is no valid delivery schedule in effect against which to measure ATK's performance under the Rocket Motor POs.

71. Accordingly, ATK is not in default of the Rocket Motor POs pursuant to FAR 52.249-8, Default.

WHEREFORE, ATK respectfully requests that the Court enter a declaratory judgment that ATK is not in default of the Rocket Motor POs because RMS waived the original delivery schedule and has not properly re-established a reasonable delivery schedule.

### COUNT IV: DECLARATORY RELIEF
### (DEFECTIVE SPECIFICATIONS)

72. ATK repeats and re-alleges the allegations set forth in paragraphs 1 through 71 above.

73. The Rocket Motor Specifications explicitly state how the rocket motors were to be manufactured, including the propellant to be used, and do not permit ATK to deviate from the specifications.

74. Although ATK complied with the Rocket Motor Specifications, the resulting rocket motors did not pass the -65°F cold static fire test.

75. The Rocket Motor Specifications are defective.

76. RMS breached its implied contractual warranty that if ATK followed the Rocket Motor Specifications, the resultant product would meet performance criteria.

77. Under FAR 52.249-8, Default, ATK's inability to perform is excused by the defective specifications.

WHEREFORE, ATK respectfully requests that the Court enter a declaratory judgment that ATK's inability to meet cold static fire test requirements is excusable because the design specifications provided by RMS are defective.

## COUNT V: DECLARATORY JUDGMENT (IMPROPER TERMINATION FOR DEFAULT; CONVERSION TO TERMINATION FOR CONVENIENCE)

78. ATK repeats and re-alleges the allegations set forth in paragraphs 1 through 77 above.

79. For the reasons stated in Counts I-IV above, ATK is not in default of the Rocket Motor POs. Alternatively, if ATK is in technical default of the Rocket Motor POs, the default is excusable.

80. Accordingly, RMS's termination for default of the Lot 23 and 24 POs was improper under FAR 52.249-8, Default.

81. FAR 52.249-8 requires that "[i]f, after termination, it is determined that [ATK] was not in default, or that the default was excusable, the rights and obligations of the parties shall be the same as if the termination had been issued for the convenience of [RMS]"

WHEREFORE, ATK respectfully requests that the Court enter a declaratory judgment that RMS's termination of the Lot 23 and 24 POs for default was improper under FAR 52.249-8, Default, and that ATK's rights are the same as if the termination had been issued for the convenience of RMS pursuant to FAR 52.249-2, Termination for Convenience.

### COUNT VI: BREACH OF CONTRACT, IN THE ALTERNATIVE (IMPROPER TERMINATION FOR DEFAULT)

82. ATK repeats and re-alleges the allegations set forth in paragraphs 1 through 81 above.

83. For the reasons stated in Counts I-IV above, ATK is not in default of the Rocket Motor POs. Alternatively, if ATK is in technical default of the Rocket Motor POs, the default is excusable, and RMS's termination constitutes a breach of contract.

84. As a result of RMS's breach of contract, ATK has suffered damages in excess of $30 million.

WHEREFORE, ATK respectfully requests, in the alternative, that the Court enter judgment in its favor and against RMS finding that RMS's improper termination for default of the Lot 23 and 24 POs constituted a breach of contract and that ATK is entitled to damages in an amount to be determined at trial, but not less than $30 million, plus interest.

### COUNT VII: BREACH OF CONTRACT (DEFECTIVE SPECIFICATIONS)

85. ATK repeats and re-alleges the allegations set forth in paragraphs 1 through 84 above.

86. As described in paragraphs 72-77 above, the Rocket Motor Specifications are defective.

87. The defective specifications constitute a breach of RMS's implied warranty of adequacy of specifications.

88. The defective specifications caused ATK to incur substantial additional costs.

89. ATK has suffered damages in excess of $30 million as a result of the defective specifications.

WHEREFORE, ATK respectfully requests that the Court enter judgment in its favor and against RMS in an amount to be determined at trial, but not less than of $30 million, plus interest, for RMS's breach of the implied warranty of specifications.

## PRAYER FOR RELIEF

WHEREFORE, ATK respectfully requests that the Court enter judgment in its favor and against RMS as described above, and such other and further relief as this Court may deem proper.

Respectfully submitted,

*[signature]*

John Marshall Cook (VA Bar No. 36066)
John S. Pachter (VA Bar No. 00425)
Gregory A. Smith (VA Bar No. 12877)
Ashley N. Barbera Amen (VA Bar No. 81830)

SMITH PACHTER MCWHORTER, P.L.C.
8000 Towers Crescent Drive, Suite 900
Vienna, VA 22182
Telephone: (703) 847-6300
Facsimile: (703) 847-6312

*Counsel for Plaintiff Alliant Techsystems Inc.*